IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

WHITNEY INGLE,

    Plaintiff,

v.

CHEMTREAT, INC.,

Serve:
R/A CT Corporation System
4701 Cox Rd., St. 285
Glen Allen, VA 23060-6808

AND

THE ALLEN MANUFACTURING COMPANY
D/B/A "DANAHER CORP.",

Serve:
R/A CT Corporation System
4701 Cox Rd., St. 285
Glen Allen, VA 23060-6808

    Defendants.

Case No: 3:21-CV-206

JURY TRIAL DEMAND

**COMPLAINT**

COMES NOW, Whitney Ingle ("Ms. Ingle" or "Plaintiff"), by counsel, and states as her Complaint against Defendants ChemTreat, Inc. and The Allen Manufacturing Company, d/b/a "Danaher Corp." ("ChemTreat" or "Defendants"), the following:

**I. JURISDICTION AND VENUE**

1.    This Court has jurisdiction over this matter as it arises from the federal questions presented by the Age Discrimination in Employment Act, as codified under Title 29 U.S.C. §§ 621 through 634 ("ADEA") and Title VII of the Civil Rights Act of 1964,

1

the Civil Rights Act of 1991, as codified under 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). *See generally* 28 U.S.C. § 1331; 28 U.S.C. § 1343(a)(4).

2. Venue is appropriate as the acts and/or omissions of Defendants from which the causes of action arise, occurred within the Eastern District of Virginia, Richmond Division. *See* 28 U.S.C. § 1391(b)(2).

3. Due to its contacts within the Commonwealth of Virginia, Defendants avail themselves to the jurisdiction of this Court.

4. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in November of 2020. Plaintiff received a Dismissal and Notice of Rights from the EEOC dated December 30, 2020, attached hereto as **EXHIBIT A**. Plaintiff files suit within ninety (90) days of receipt of that Dismissal and Notice of Rights.[1]

## II. THE PARTIES

5. Ms. Ingle was born in 1958[2], and is a resident of Kents Store, Virginia.

---

[1] As it relates to Counts II & III, Failure to Hire, the underlying facts of which only recently occurred, Ms. Ingle currently has a second EEOC charge pending which has been appended to this matter as **EXHIBIT B**. Plaintiff takes the position that retaliation claims need not be fully exhausted prior to filing. *See Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992) (holding that a federal court plaintiff may assert a retaliation claim which arose after the filing of an administrative charge without separately exhausting that post-charge retaliation claim). As it relates to the underlying discrimination claims, Plaintiff takes the position that the actions are a "continuing action". *See Nat'l RR Passenger Corp (AMTRAK) v. Morgan*, 536 U.S. 101 (2002); *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 140 (4th Cir. 2007) (The Fourth Circuit has recognized the "'modern' continuing violation theory" of employment discrimination, hostile work environment, and constructive discharge since 2007).

Regardless, subsequent to 180 days, Plaintiff intends to request a dismissal and notice of rights and will formally amend this Complaint with the Court's permission. As another alternative, Plaintiff requests that the Court stay this matter until the dismissal and notice of rights for the secondary EEOC charge is received shortly after the 180 day investigation by the EEOC so that all of her claims may properly proceed at one time for judicial efficiency. Plaintiff includes all of these claims in the initial Complaint for transparency.

[2] Ms. Ingle's exact date of birth is not included due to privacy concerns, and due to filing requirements as per the United States District Court Eastern District of Virginia Local Rules.

6. ChemTreat, Inc., an operating company of Danaher Corporation, is a Richmond, Virginia-based provider of chemical water treatment products and services for industrial and commercial markets.

7. In 2007, ChemTreat, Inc. was acquired by Danaher Corporation, a fortune-500 global science and technology conglomerate headquartered in Washington, D.C. Danaher's businesses are concentrated in the fields of design, manufacturing, and marketing of industrial and consumer products, currently operating in five segments: Environmental, Test & Measurement, Dental, Life Sciences & Diagnostics, and Industrial Technologies.

### III. FACTUAL ALLEGATIONS

8. Ms. Ingle, currently 62 years of age, was hired by Defendants in September of 2017, as a Human Resources Business Partner.

9. Ms. Ingle transitioned to Defendants as an experienced human resources representative with a stellar employment record.

10. Indeed, during her thirty- year career in human resources, Ms. Ingle never received a performance improvement plan or disciplinary warning.

11. Ms. Ingle managed a team of human resources professionals and partnered with a commercial team of more than 550 sales and technical professionals, the largest team in the company. Ms. Ingle traveled extensively for this role.

**Joint Employers**

12. Due to the blended corporate nature of the companies, Ms. Ingle was jointly employed by ChemTreat and its corporate parent, The Allen Manufacturing Company d/b/a Danaher Corporation.

13. Alternatively, the apparent agent and/or integrated employer theories cause both entities to have liability in this matter.

14. As examples, upon information and belief, Defendants shared the following non-exhaustive roles and responsibilities regarding the employment of Ms. Ingle and other ChemTreat employees:

   a. Both Defendants had the authority to provide daily directives and supervision to Ms. Ingle. Indeed, Danaher was integral to ChemTreat's development and management of Key Performance Indicators (KPIs). Each functional group had GEMBA boards that displayed progress, and team members would meet at the boards weekly to review how they were doing. Danaher executives would meet at ChemTreat bi-annually and visit some of the GEMBA boards and Ms. Ingle and other employees would present the KPI's, give updates and share strategies in place or under consideration to improve results.

   b. Both Defendants provided materials and various equipment, objects, and implements for Ms. Ingle to work.

   c. Both Defendants maintained employment and personnel records of Ms. Ingle.

   d. Both Defendants shared the administration and execution of recruitment and selection. Indeed, when Ms. Ingle applied for, and received notice for the below referenced position with ChemTreat, she received notice from Danaher.

   e. Both Defendants shared the administration and execution of various payroll, leave functions, health benefits, and workers' compensation plans.

  f. The ChemTreat Human Resources team was provided a legal resource through Seyfarth Shaw - HR4HR. Ms. Ingle and others were encouraged to rely on these attorneys for employee relations matters. The Danaher legal team managed this relationship, and if the matter became complicated, members of the Danaher legal team would become involved.

**Ingle Discouraged from Advancement | Not Long Enough "Runway"**

15. Ms. Ingle was the oldest member of the human resources team at ChemTreat and enjoyed the most tenure among the HR managers.

16. Unfortunately, at ChemTreat, that experience does not translate to advancement within the company structure.

17. On or about November 2018, Ms. Ingle discussed with Heathre Moler, Vice President of Human Resources and one of Ms. Ingle's supervisors, Ms. Ingle's interest in the position of Director, Human Resources Commercial NA (North America).

18. Ms. Moler was the direct supervisor for this open position and immediately discouraged Ms. Ingle from applying for the position.

19. Ms. Moler advised Ms. Ingle the Director position for which Ms. Ingle was interested required "a long runway" and implied that Ms. Ingle did not have enough "runway" to the VP of HR role in front of her to be "considered" for such a position.

20. Ms. Ingle understood the term "runway" to mean longevity of life and felt that it was an inappropriate comment given both her age and experience.

21. Ms. Ingle responded that she believed she had the experience and expertise for the Director position. Ms. Ingle also inquired with Ms. Moler how Ms. Ingle's role differed significantly from the newly created Director positions that were posted given the

5

fact that she partnered with the largest team in the company, traveled extensively and the job description and duties were similar to Ms. Ingle's current position.

22. Ms. Moler continued to discourage Ms. Ingle from applying.

23. Ms. Moler then inquired with Ms. Ingle how much longer Ms. Ingle intended to remain employed at ChemTreat by asking, "Are you going to stay here much longer?"

24. Even though Ms. Moler was aware that Ms. Ingle intended to remain employed and ultimately retire from ChemTreat due to previous discussions regarding the same, Ms. Ingle again informed Ms. Moler that Ms. Ingle intended to retire from ChemTreat.

**Ms. Ingle Receives Younger Supervisor – Work Place Devolves**

25. Not long after this conversation with Ms. Moler, in or around December of 2018, Ms. Ingle received a small adjustment. Her job title was changed to Senior Manager HR Commercial NA and she received a nominal pay increase.

26. In or around April of 2019, Deb Misetich was awarded the Director, Human Resources Commercial NA (North America) position, which was a supervisory position to Ms. Ingle. Notably, Ms. Misetich is significantly younger than Ms. Ingle.

27. Ms. Ingle was informed that Ms. Misetich would focus on South America operations while she (Ms. Ingle) would remain focused on North America. However, Ms. Misetich began establishing relationships with leaders Ms. Ingle supported in North America, purposefully undercutting Ms. Ingle's leadership role in these areas, and refused to communicate with Ms. Ingle.

28. As a result, confusion and delays occurred in developing and implementing strategic initiatives assigned to Ms. Ingle.

29. In August and/or September of 2019, Ms. Ingle attempted to speak professionally but candidly with Ms. Misetich about her poor communication with Ms. Ingle and other team members. Ms. Ingle inquired what she (Ms. Ingle) could do differently to receive timely feedback and direction from Ms. Misetich and provided several examples of inquires that remained unanswered by Ms. Misetich for months despite multiple inquiries by Ms. Ingle.

30. In bi-weekly, one-on-one meetings, Ms. Ingle routinely inquired why she was no longer receiving "reach" assignments (assignments with higher visibility that could result in opportunities for advancement and that would challenge her professionally, etc.).

31. Ms. Misetich responded that Ms. Ingle was on track and everything was fine.

32. Unfortunately, Ms. Misetich's behavior and leadership skills did not improve. Rather, they deteriorated as Ms. Misetech devolved into making numerous inappropriate and sexualized comments in the workplace to Ms. Ingle and others.

33. As one example, Ms. Misetich bragged about her numerous sexual interactions with her boyfriend, whom she made a point of sharing was still married to another woman.

34. As another example, Ms. Misetich stated in front of Ms. Ingle and two of Ms. Ingle's direct reports that one direct report should "keep her legs open to have a happy marriage".

**Ms. Ingle Complains to Ms. Moler**

35. In February of 2020, Ms. Misetich's management and communication skills had not improved and her behavior remained unprofessional.

7

36. Accordingly, Ms. Ingle made a formal complaint to Ms. Moler, who was Ms. Misetich's supervisor.

37. Ms. Ingle expressed her concern to Ms. Moler about the confusion caused by Ms. Misetich's contact with the NA team leaders, Ms. Misetich's constant failure to timely respond to communications, and further reported to Ms. Moler that Ms. Misetich made inappropriate sexual comments at the workplace.

38. Ms. Moler did not adequately respond to these legitimate complaints. Rather, in response, Ms. Moler instructed Ms. Misetich to schedule weekly meetings with Ms. Ingle to check in.

39. During the subsequent and inconsistent one on one meetings, Ms. Ingle always shared a list of topics with Ms. Misetich. Ms. Misetich shared minimal information in return.

40. Ms. Ingle offered to help, expressed interest in assignments and special projects, and generally offered to take on more work. These requests went unanswered.

41. Indeed, Ms. Moler as Ms. Misetich's supervisor, also failed to adequately follow up with Ms. Ingle in regard to her legitimate complaints.

42. Ms. Misetich was known to brag about her close and friendly relationship with Ms. Moler.

43. Ms. Moler's lack of interest and her close friendship Ms. Misetich made Ms. Ingle increasingly uncomfortable. Accordingly, even though the situation did not improve, Ms. Ingle did not make any further complaints.

## Ms. Ingle Terminated from Employment

44. In August of 2020, Ms. Ingle was on vacation in Vancouver, BC for the birth of her first grandchild.

45. While on vacation, Ms. Ingle prepared for a telephone conference with Ms. Misetich that she understood was to be her mid-year review.

46. Instead, during this call, Ms. Ingle was abruptly informed that her position was being eliminated.

47. Ms. Ingle was specifically advised that Ms. Ingle was not being terminated from employment for work performance issues.

48. Because Ms. Ingle was not terminated for cause, due to company policy, she was eligible for rehire.

49. Ms. Ingle was not offered an opportunity to transfer to another position within the company.

50. Upon information and belief, Ms. Misetich, an individual much younger than Ms. Ingle, thereafter assumed Ms. Ingle's job duties.

51. Any reasons cited by Defendants for decisions with regard to Ms. Ingle are pretextual.

## ChemTreat Fails to Re-Hire Ms. Ingle

52. Upon information and belief, Ms. Ingle was eligible for rehire at ChemTreat.

53. On or around January of 2021, Ms. Ingle submitted an application for an employment opportunity at ChemTreat.

54. Specifically, Ms. Ingle applied for an open Human Resources Business Partner position.

9

55. Ms. Ingle was qualified and possessed all of the requisite skills, background, and requirements for this position.

56. Ms. Ingle was actually overly qualified for this position. Indeed, this was a position similar to the position Ms. Ingle held while at ChemTreat, prior to her position adjustment.

57. Even so, Ms. Ingle failed to even receive an interview for the position.

58. Upon information and belief, an individual in her thirties, and much younger than Ms. Ingle, was hired for this position.

59. Due to the acts and omissions of Defendants, Ms. Ingle was discriminated against and retaliated against in violation of the ADEA and Title VII.

60. Because the actions taken by Ms. Ingle's supervisory employees were taken within the scope of their employment, Defendants are responsible for their actions based upon the doctrine of *respondeat superior*.

**COUNT I: CLAIM FOR DISCRIMINATION IN VIOLATION OF THE ADEA**

61. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

62. At the time of her termination from employment, Plaintiff was 62 years of age, and protected from age discrimination by the ADEA.

63. During her employment with Defendants, Plaintiff experienced unwelcome discrimination and commentary based upon her age.

64. Specifically, Defendants unlawfully targeted Plaintiff, treated her differently, and less preferably than younger employees, made age related commentary to her, discouraged her from applying for a position for which she was qualified, subjected her to increased scrutiny, failed to adequately address her legitimate complaints, and

terminated her employment by eliminating her position and refusing her an opportunity to transfer to another position within the company, all in violation of the ADEA.

65. Defendants would not have terminated Plaintiff, or taken the other discriminatory actions against her, but for Plaintiff's age.

66. Defendants' conduct towards Plaintiff was discriminatory and intentional, as no business-related legitimate reason justified the actions taken against her, as prior to Plaintiff's termination from employment, Plaintiff was performing her work at a satisfactory level.

67. Any reasons cited by Defendants for Plaintiff's termination were pretextual, as Plaintiff's work performance was meeting Defendants' legitimate business expectations and there was no legitimate reason to eliminate Plaintiff's position.

68. Upon information and belief, after Plaintiff's termination from employment, her job duties were taken over by one or more employees of Defendants, all of whom are younger than Plaintiff.

69. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

70. At all times material hereto, Defendants engaged in a discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Plaintiff so as to support an award of liquidated damages.

71. The above-described acts by Defendants and employees of Defendants constitute age discrimination in violation of the Age Discrimination in Employment Act, as codified under Title 29 U.S.C. §§ 621 through 634 ("ADEA").

## COUNT II:  CLAIM FOR DISCRIMINATION AND RETALIATION IN VIOLATION OF THE ADEA – FAILURE TO HIRE

72. Ms. Ingle incorporates by reference herein the preceding paragraphs of this Complaint.

73. At the time of Defendants' failure to hire Ms. Ingle, Ms. Ingle was 62 years of age, and protected from discrimination and retaliation by the ADEA.

74. Prior to the unlawful failure to hire Ms. Ingle, Ms. Ingle was performing her work at a satisfactory level and meeting the legitimate business expectations of Defendants. Indeed, she was specifically advised that her work performance was not a catalyst for her earlier termination from employment.

75. Ms. Ingle was technically eligible for rehire with Defendants.

76. However, Ms. Ingle made federally protected complaints to Defendants about her supervisor concerning the age-based discriminatory treatment she endured as well as sexualized comments in the workplace.

77. However, Defendants failed to meaningfully address Ms. Ingle's above-referenced complaints and, instead, retaliated against her by eliminating her position, not providing her with an opportunity to transfer, and later failing to consider her for an available position, for which she was overly qualified.

78. Defendants would not have failed to hire Ms. Ingle or taken the other discriminatory and retaliatory actions against her, but for Ms. Ingle's age and legitimate complaints and/or the EEOC charge she filed subsequent to her termination from employment.

79. The discriminatory and retaliatory actions taken against Ms. Ingle, including Defendants' termination of employment of Ms. Ingle, failure to provide her with

an opportunity to transfer within the company, and failure to hire Ms. Ingle, are causally connected to Ms. Ingle's complaints and/or the EEOC charge she filed subsequent to her termination from employment.

80. Any reasons cited by Defendants for failing to transfer and later hire Ms. Ingle for employment were pretextual as Ms. Ingle's previous work performance was meeting legitimate business expectations, she was eligible for rehire, and was qualified (overly qualified, in fact) for the available position.

81. Upon information and belief, the position was filled by an individual, who was significantly younger than Ms. Ingle.

82. As a direct and proximate result of Defendants' actions, Ms. Ingle has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

83. At all times material hereto, Defendants engaged in discriminatory and retaliatory practices with malice or reckless indifference to the federally protected rights of Ms. Ingle so as to support an award of liquidated damages.

84. The above-described acts by Danaher Corp. and employees of Danaher Corp. constitute discrimination and retaliation in the form of a failure to hire, all in violation of the Age Discrimination in Employment Act, as codified under Title 29 U.S.C. §§ 621 through 634 ("ADEA").

### COUNT III:  CLAIM FOR RETALIATION IN VIOLATION OF TITLE VII – FAILURE TO HIRE

85. Ms. Ingle incorporates by reference herein the preceding paragraphs of this Complaint.

86. At the time of her Defendants' failure to hire Ms. Ingle, Ms. Ingle was protected from retaliation by Title VII.

87. Prior to the unlawful failure to hire of Ms. Ingle, Ms. Ingle was performing her work at a satisfactory level and meeting the legitimate business expectations of Defendants. Indeed, she was specifically advised that her work performance was not a catalyst for her earlier termination from employment.

88. Ms. Ingle was technically eligible for rehire with Defendants.

89. However, Ms. Ingle made federally protected complaints to Defendants about her supervisor concerning the age-based discriminatory treatment she endured as well as sexualized comments in the workplace.

90. However, Defendants failed to meaningfully address Ms. Ingle's above-referenced complaints and, instead, retaliated against her by eliminating her position, not providing her with an opportunity to transfer, and later failing to consider her for an available position, for which she was overly qualified.

91. Defendants would not have failed to hire Ms. Ingle or taken the other discriminatory and retaliatory actions against her, but for Ms. Ingle's age and sex-based legitimate complaints and/or the EEOC charge she filed subsequent to her termination from employment.

92. The discriminatory and retaliatory actions taken against Ms. Ingle, including Defendants' failure to hire Ms. Ingle, are causally connected to Ms. Ingle's complaints and/or the EEOC charge she filed subsequent to her termination from employment.

93. Any reasons cited by Defendants for failing to transfer and later hire Ms. Ingle for employment were pretextual as Ms. Ingle's previous work performance was

meeting legitimate business expectations, she was eligible for rehire, and was qualified (overly qualified, in fact) for the available position.

94. As a direct and proximate result of Defendants' actions, Ms. Ingle has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary loss.

95. At all times material hereto, Defendants engaged in discriminatory and retaliatory practices with malice or reckless indifference to the federally protected rights of Ms. Ingle so as to support an award of punitive damages.

96. The above-described acts by Danaher Corp. and employees of Danaher Corp. constitute retaliation in the form of a failure to hire, all in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, as codified under 42 U.S.C. §§ 2000e, *et seq*. ("Title VII").

WHEREFORE, Plaintiff Whitney Ingle prays for judgment against Defendants ChemTreat, Inc. and Danaher Corp. Industries, Inc., and for equitable relief, compensatory and punitive and/or liquidated damages, together with prejudgment interest from the date of Ms. Ingle's termination from employment, and for costs and attorneys' fees, and for such other and further relief as may be just and equitable.

TRIAL BY JURY IS DEMANDED.

Respectfully Submitted,

**WHITNEY INGLE**

/s/ Thomas E. Strelka

        Thomas E. Strelka, Esq. (VSB# 75488)
        L. Leigh R. Strelka, Esq. (VSB # 73355)
        N. Winston West, IV, Esq. (VSB # 92598)
        Brittany M. Haddox, Esq. (VSB # 86416)
        Monica L. Mroz, Esq. (VSB #65766)
        STRELKA EMPLOYMENT LAW
        Warehouse Row
        119 Norfolk Avenue, S.W., Suite 330
        Roanoke, VA  24011
        Tel:  540-283-0802
        thomas@strelkalaw.com
        leigh@strelkalaw.com
        winston@strelkalaw.com
        brittany@strelkalaw.com
        monica@strelkalaw.com

        *Counsel for Plaintiff*

**<u>VERIFICATION</u>**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that: (1) I have reviewed this Complaint; (2) Regarding the allegations of which I have personal knowledge, I believe them to be true; and (3) Regarding the allegations of which I do not have personal knowledge, I believe them to be true based on specified information, documents, or both and the foregoing is true and correct.

WHITNEY INGLE